IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| ***In re Xsolis, Inc. Data Breach Litigation*** | Case No. 3:26-CV-00791<br><br>District Judge Eli J. Richardson<br>Magistrate Judge Jeffery S. Frensley<br><br>**JURY DEMANDED**<br><br>**CLASS ACTION** |

# CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Eugene Chu, Jeffrey McGrath, Ray Wieters, LaWanda Campbell, Jill Hurant, Noah David Jensen, Gina Longoria, Kale Tinsley, Richard Jesky, Juells McLeod, Daynique Johnson, and James Soward ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members") bring this class action complaint against Defendant Xsolis, Inc. ("Defendant"), alleging as follows.

## NATURE OF THE ACTION

1. This putative class action is about Defendant's failure to properly secure and safeguard Plaintiffs' and Class Members' sensitive personally identifiable information ("PII") and personal health information ("PHI") from a foreseeable, preventable data breach.

2. On January 20, 2026, criminal hackers accessed Defendant's network systems and stole Plaintiffs' and Class Members' PII and PHI stored therein, including their names, addresses, dates of birth, Social Security numbers, health insurance information, and medical treatment information (collectively, "Private Information"), causing widespread injuries and damages to Plaintiffs and Class Members (the "Data Breach").

3. Defendant is an artificial intelligence company that services patients and health care providers across the country.

4. Plaintiffs and Class Members are current and former patients of Defendant's clients who, in order to obtain services from Defendant or its clients, were and are required to entrust Defendant with their sensitive and confidential Private Information. Defendant could not perform its operations or provide the services it does without collecting Plaintiffs' and Class Members' Private Information and retains it for many years, at least, even after the patient-provider relationship has ended.

5. As a business handling Private Information, Defendant owes the individuals to whom the data relates a duty to adopt reasonable measures to protect such information from disclosure to unauthorized parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals, including but not limited to the invasion of their private health matters.

6. Defendant breached these duties owed to Plaintiffs and Class Members by failing to safeguard their Private Information that it collected and maintained, including by failing to implement industry standards for data security to protect against cyberattacks, which failures caused and allowed criminal hackers to target, access, and steal hundreds of thousands of current and former patients' Private Information from Defendant's care.

7. Defendant failed to adequately protect Plaintiffs' and Class Members' Private Information, and failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect its patients' sensitive data.

8. Defendant maintained the Private Information in a reckless manner. In particular,

Private Information was maintained on and/or accessible from Defendant's network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus, Defendant knew failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

9. Given that the hackers were able to infiltrate Defendant's information systems and perform malicious activity—including reconnaissance and data exfiltration functions that should have had alarm bells ringing—it is likely that Defendant failed to implement reasonable industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralized alerting and logging.

10. On information and belief, the Data Breach was the result of a "phishing" incident, whereby hackers may use impersonation or spam to convince a user within Defendant's network to click a link, open a file, share a password, or otherwise install malware appearing to be benign to the user.

11. On information and belief, because the phishing attempt was not reported and the Data Breach was not detected quickly, it is likely Defendant had woefully inadequate cybersecurity training for its employees and network users, and it lacked sufficient detection protocols to observe an intruder walking through its front door.

12. Coupled with its inadequate training, Defendant's failure to detect the Data Breach rises to the level of recklessness in caring for the Private Information of Plaintiffs and Class Members.

13. In other words, Defendant had no effective means to prevent, detect, stop, or

mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to Plaintiffs' and Class Members' Private Information.

14. Given Defendant's failure in even the most basic requirements of cybersecurity, it is likely that Defendant's cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Personal Information, thus leaving them exposed to the Data Breach that indeed came to fruition.

15. Such a failure is beyond ordinary negligence – Defendant's disregard of Plaintiffs' and Class Members' rights was intentional, willful, or reckless when Defendant failed to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failed to take standard and reasonably available steps to prevent the Data Breach; and failed to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

16. Moreover, despite learning of the Data Breach on or around January 22, 2026, Defendant waited until June 5, 2026 to post notice on their website to inform the victims of the Data Breach (the "Online Notice") and to send Notice of Data Breach letters attached hereto as **Exhibit A** ("Notice Letter").[1, 2]

17. This timeline portrays a shockingly ill-prepared cybersecurity posture, particularly because Tenn. Code Ann. § 47-18-2107 mandates that, following discovery or notification of a breach of a security system by an information holder, the information holder—which means any persons or businesses that conducts business in Tennessee and owns or licenses computerized personal information of Tennessee residents—shall disclose the breach of system security to any resident whose personal information was, or is reasonably believed to have been, acquired by an

---

[1] Ex. A.
[2] https://www.xsolisdataincident.com/ (last visited June 12, 2026).

unauthorized person no later than ***45 days*** from the discovery or notification of the breach.

18. That Defendant waited so long to notify potential victims of the Data Breach demonstrates it was ill-equipped to address (much less prevent) such a foreseeable incident.

19. Further, as discussed below, Defendant's Notice Letter obfuscated the nature of the breach and the threat it posed—refusing to tell Plaintiffs and Class Members how the Data Breach occurred or any remedial measures taken in response thereto.

20. Defendant's six-month delay in informing and failure to provide clear notice of the Data Breach – even though Plaintiffs and Class Members had their most sensitive information accessed, exfiltrated, and stolen – caused Plaintiffs and Class Members to suffer ascertainable losses in the form of the loss of the benefit of their bargain and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

21. Criminal hackers targeted and obtained Plaintiffs' and Class Members' Private Information from Defendant's network because of the data's value in exploiting and stealing their identities. As a direct and proximate result of Defendant's inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information has been and will continue to be exposed to and misused by an untold number of unauthorized individuals. The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

22. The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of his or her life. Mitigating that risk, to the extent it is even possible to do so, requires

individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

23. As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress arising from dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it.

24. To recover from Defendant for these harms, Plaintiffs, on their own behalf and for the Class as defined herein, bring claims for gross negligence/negligence *per se*, breach of third-party beneficiary contract, invasion of privacy, and unjust enrichment to address Defendant's inadequate safeguarding of Plaintiffs' and Class Members' Private Information in its care.

25. Plaintiffs and Class Members seek compensatory damages, declaratory judgment, and injunctive relief requiring Defendant to (a) disclose, expeditiously, the full nature of the Data Breach and the types of Private Information exposed; (b) implement improved data security practices to reasonably guard against future breaches of Private Information in Defendant's possession; and (c) provide, at Defendant's own expense, all impacted Data Breach victims with lifetime identity theft protection services.

## PARTIES

### *Plaintiffs*

26. Plaintiff Eugene Chu is a natural person and citizen of Arlington, Virginia where he intends to stay.

27. Plaintiff Jeffrey McGrath is a natural person and citizen of Alexandria, Virginia where he intends to stay.

28. Plaintiff Ray Wieters is a natural person and citizen of Glendale, Arizona where he intends to stay.

29. Plaintiff LaWanda Campbell is a natural person and citizen of Washington, DC where she intends to stay.

30. Plaintiff Jill Hurant is a natural person and citizen of Marlboro, New Jersey where she intends to stay.

31. Plaintiff Noah David Jensen is a natural person and citizen of Glendale, Arizona where he intends to stay.

32. Plaintiff Gina Longoria is a natural person and citizen of Glendale, Arizona where she intends to stay.

33. Plaintiff Kale Tinsley is a natural person and citizen of Lynnwood, Washington where he intends to stay.

34. Plaintiff Richard Jesky is a natural person and citizen of Mesa, Arizona where he intends to stay.

35. Plaintiff Juells McLeod is a natural person and citizen of Rochester, Minnesota where she intends to stay.

36. Plaintiff Daynique Johnson is a natural person and citizen of Eau Claire, Wisconsin

where she intends to stay.

37. Plaintiff James Soward is a natural person and citizen of Tucson, Arizona where he intends to stay.

***Defendant Xsolis, Inc.***

38. Defendant is organized under Delaware law with its headquarters and principal place of business located at 4031 Aspen Grove Drive, Suite 500, Franklin, Tennessee 37067.

## JURISDICTION AND VENUE

39. The Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5 million, exclusive of interest and costs, and the number of Class Members exceeds 100, some of whom (including Plaintiffs) have different citizenship from Defendant.

40. The Court has personal jurisdiction over Defendant because Defendant maintains its headquarters in Tennessee and engages in substantial and not isolated activity in this state.

41. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to this action occurred in this District; and because Defendant is headquartered in this District, maintains Plaintiffs' and Class Members' Private Information in this District, and has injured Class Members in this District.

## FACTUAL BACKGROUND

### A. Defendant Owed Duties to Adopt Reasonable Data Security Measures for Private Information it Collected and Maintained.

42. Defendant is an artificial intelligence company that services patients and health care providers across the country.

43. Plaintiffs and Class Members are current and former patients of Defendant's clients who, as a condition and in exchange for receiving services from Defendant, were and are required

to entrust Defendant with highly sensitive Private Information.

44. Defendant benefited substantially from Plaintiffs' and Class Members' Private Information and could not perform its operations or provide the services it does without collecting and using that data. For example, Defendant required Private Information to help hospitals, health systems, and payers make more objective medical-necessity and utilization-management decisions.

45. In exchange for receiving Plaintiffs' and Class Members' Private Information, Defendant promised to safeguard the sensitive, confidential data and use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

46. At all relevant times, Defendant knew it was storing and using its networks to store and transmit valuable, sensitive Private Information belonging to Plaintiffs and Class Members, and that as a result, its systems would be attractive targets for cybercriminals.

47. Defendant also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into those individuals' highly private medical information.

48. Upon information and belief, Defendant made promises and representations to its patients and clients, including Plaintiffs and Class Members, that the Private Information collected from them as a condition of obtaining services from Defendant would be kept safe and confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

49. Plaintiffs and Class Members relied on these promises from Defendant, a

sophisticated business entity, to implement reasonable practices to keep their sensitive Private Information confidential and securely maintained, to use this information for necessary purposes only and make only authorized disclosures of this information, and to delete Private Information from Defendant's systems when no longer necessary for its legitimate business or healthcare purposes.

50. But for Defendant's promises to keep Plaintiffs' and Class Members' Private Information secure and confidential, Plaintiffs and Class Members would not have sought services from or entrusted their Private Information to Defendant. Healthcare patients and consumers, in general, demand security to safeguard their Private Information, especially when Social Security numbers and sensitive medical information are involved.

51. Based on the foregoing representations and warranties and to obtain services from Defendant, Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its promises and obligations to keep it confidential and protected against unauthorized access.

52. Plaintiffs and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information. To that end, Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

53. By obtaining, using, and benefitting from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting that Private Information from unauthorized access and disclosure.

54. Defendant had and has a duty to adopt reasonable measures to keep Plaintiffs' and Class Members' Private Information confidential and protected from involuntary disclosure to third parties, and to audit, monitor, and verify the integrity of its IT networks and those of its

vendors and affiliates.

55. Additionally, Defendant had and has obligations created by the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45 ("FTC Act"), the Health Insurance Portability and Accountability Act ("HIPAA"), common law, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and protected from unauthorized disclosure. Defendant failed to do so.

**B. Defendant Failed to Adequately Safeguard Plaintiffs' and Class Members' Private Information, Causing the Data Breach.**

56. On or about June 5, 2026, Defendant began sending Plaintiffs and other Data Breach victims notifications of the Data Breach ("Notice Letters").

57. The Notice Letter generally informs as follows:

> Xsolis, Inc. ("Xsolis"), a vendor that provides case and utilization management services to healthcare organizations, is providing notice of a recent data security incident that may have involved certain personal and protected health information provided to us by our clients.
>
> On January 22, 2026, Xsolis became aware of unauthorized activity impacting a limited portion of the Xsolis environment resulting from a targeted phishing attack on January 20, 2026. We immediately contained the activity and launched an investigation with the assistance of external cybersecurity experts. The investigation determined that an unauthorized actor acquired certain files containing information that depending on the individual, may include, names, addresses, dates of birth, health insurance information, Social Security numbers, and medical treatment information. We are not aware of any actual or attempted misuse of information because of this incident.

58. Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, or the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

59. Thus, Defendant's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach was and is severely diminished.

60. Criminal hackers accessed and exfiltrated Plaintiffs' and Class Members' Private Information in the Data Breach for the purpose of misusing the Private Information and stealing Plaintiffs' and Class Members' identities and have since exposed the Private Information to an untold number of bad actors with nefarious intentions.

61. Upon information and belief, hackers first breached Defendant's network and exfiltrated Plaintiffs' and Class Members' Private Information stored in un-encrypted form therein, using common and rudimentary initial access techniques that Defendant knew or should have known were necessary to protect against.

62. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing Plaintiffs' and Class Members' Private Information, using controls like limitations on personnel with access to sensitive data and requiring multi-factor authentication for access, training its employees on standard cybersecurity practices, and implementing reasonable logging and alerting methods to detect unauthorized access.

63. For example, had Defendant implemented industry-standard logging, monitoring, and alerting systems—basic technical safeguards that any PHI and/or PII-collecting company is expected to employ—then cybercriminals would not have been able to perpetrate prolonged malicious activity in Defendant's network systems for multiple days without alarm bells going off, including the reconnaissance necessary to identify where Defendant stored Private Information, installation of malware or other methods of establishing persistence and creating a path to exfiltrate

data, staging data in preparation for exfiltration, and then exfiltrating that data outside of Defendant's system before being caught.

64. Defendant would have recognized the malicious activities detailed in the preceding paragraph if it bothered to implement basic monitoring and detection systems, which then would have stopped the Data Breach or greatly reduced its impact.

65. Defendant did not use reasonable security procedures and practices appropriate to the sensitive and confidential nature of Plaintiffs' and Class Members' Private Information it collected and maintained, such as encrypting files containing Private Information, requiring multifactor authentication ("MFA") for initial access to servers containing Private Information, or deleting Private Information from network systems when it is no longer needed, which caused that Private Information's unauthorized access and exfiltration in the Data Breach.

66. Defendant's failure to implement basic cybersecurity safeguards underscores its grossly negligent conduct in this case.

67. Additionally, to mitigate cyber threats, the Joint Cybersecurity and Infrastructure Security Agency ("CISA") recommends rudimentary actions that businesses like Defendant should take immediately: (a) installing updates for operating systems, software, and firmware as soon as they are released; (b) requiring phishing-resistant MFA (i.e., non-SMS text based) for as many services as possible; and (c) training users to recognize and report phishing attempts.

68. Upon information and belief, Defendant failed to require phishing-resistant MFA where possible or adequately train its employees to recognize and report phishing attempts. Had Defendant required phishing-resistant MFA, and/or trained its employees on reasonable and basic cybersecurity topics like common phishing techniques or indicators of a potentially malicious event, hackers would not have been able to carry out the Data Breach.

69. Further, upon information and belief, Defendant failed to install updates for operating systems, software, and firmware as soon as they were released. Had Defendant installed such updates at its first opportunity as was standard and advised, the Data Breach would not have occurred, or would have at least been mitigated.

70. As a result of Defendant's failures, Plaintiffs' and Class Members' Private Information was stolen in the Data Breach when hackers accessed and acquired files in Defendant's computer systems storing that sensitive data in unencrypted form.

71. Defendant's tortious conduct and breach of contractual obligations, as detailed herein, are evidenced by its failure to recognize the Data Breach until cybercriminals had already accessed Plaintiffs' and Class Members' Private Information for days, meaning Defendant had no effective means in place to detect, prevent, or stop cyberattacks.

72. As the Data Breach evidences, Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive Private Information it collected and maintained from Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed. These failures by Defendant allowed and caused cybercriminals to target Defendant's network and carry out the Data Breach.

73. Plaintiffs' and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Criminal hackers accessed and acquired confidential files containing Plaintiffs' and Class Members' Private Information from Defendant's network systems, where they were kept without adequate safeguards and in unencrypted form.

74. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing Plaintiffs' and Class Members' Private Information, but failed to do so.

**C. Defendant Knew of the Risk of a Cyberattack because Entities in Possession of Private Information are Particularly Susceptible.**

75. Defendant's negligence in failing to safeguard Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

76. Private Information of the kind accessed in the Data Breach is of great value to hackers and cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the dark web.

77. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information linked to an individual, such as his or her birthdate, birthplace, and mother's maiden name.

78. Data thieves regularly target entities in the healthcare industry like Defendant due to the highly sensitive information that such entities maintain. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

79. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or, if acting as a reasonable healthcare provider, should have known that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

80. According to the Identity Theft Resource Center's report covering the year 2021,

"the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[3]

81. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant itself. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[4]

82. Defendant's data security obligations were particularly important given the substantial increase, preceding the date of the subject Data Breach, in cyberattacks and/or data breaches targeting healthcare entities like Defendant that collect and store PHI.

83. For example, of the 1,862 data breaches recorded in 2021, 330 of them, or 17.7%, were in the healthcare industry.

84. The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

85. Entities in custody of PHI, like Defendant, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach. Indeed, when compromised, healthcare-related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve

---

[3] IDENTITY THEFT RESOURCE CENTER, *Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises*, Jan. 24, 2022, https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/.

[4] IBM, *Cost of a data breach 2022: A million-dollar race to detect and respond*, available at https://www.ibm.com/reports/data-breach (last visited August 5, 2026).

an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[5] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.

86. Thus, the healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[6]

87. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[7] A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.

88. As a healthcare entity in possession of its patients' and clients' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its data

---

[5] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET, March 3, 2010, https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[6] SWIVELSECURE, *9 reasons why healthcare is the biggest target for cyberattacks*, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited August 5, 2026).

[7] IDEXPERTS, *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, May 14, 2015, https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

security systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

89. Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

90. Given the nature of the Data Breach, it was foreseeable that Plaintiffs' and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs' and Class Members' names.

91. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its network server(s), amounting to hundreds of thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of that unencrypted data.

92. Plaintiffs and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

93. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and the like.

### D. Defendant Was Required, but Failed to Comply with FTC Rules and Guidance.

94. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

95. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

96. The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

97. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

98. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting

from these actions further clarify the measures businesses like Defendant must undertake to meet their data security obligations.

99. Such FTC enforcement actions include actions against healthcare entities that fail to safeguard Private Information like Defendant. *See, e.g., In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

100. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

101. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[8]

102. Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

103. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply

[8] FEDERAL TRADE COMMISSION, *Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable)*, December 7, 2009, http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

**E. Defendant Was Required, But Failed to Comply with HIPAA.**

104. Defendant is a covered business under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C.

105. Defendant is further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. *See* 42 U.S.C. §17921; 45 C.F.R. § 160.103.

106. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

107. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

108. HIPAA's Security Rule required and requires that Defendant do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

109. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

110. HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. *See* 45 C.F.R. § 164.306(a)(1), (a)(3).

111. HIPAA further requires a covered entity like Defendant to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

112. HIPAA further requires a covered entity like Defendant to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

113. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in

the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." U.S. Department of Health & Human Services, *Security Rule Guidance Material*.[9] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." U.S. Department of Health & Human Services, *Guidance on Risk Analysis*.[10]

114. Additionally, HIPAA's Breach Notification Rule requires that within 60 days of discovering a breach of unsecured patient PHI, as is this Data Breach, Defendant must notify each individual affected regarding the nature of the breach, the PHI compromised, steps the individual should take to protect against potential resulting harm, and what Defendant is doing to protect against future breaches. 45 C.F.R. § 164.404(b).

115. As alleged in this Complaint, Defendant failed to comply with HIPAA and HITECH. It failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach, and failed to ensure the confidentiality and protection of Plaintiffs' and Class Members' Private Information, including PHI.

**F. Defendant Failed to Comply with Industry Standards.**

116. A number of industry and national best practices have been published and are

[9] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited August 5, 2026).

[10] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited August 5, 2026).

widely used as a go-to resource when developing an institution's cybersecurity standards.

117. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

118. In addition, the NIST recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

119. Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing

the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[11]

120. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, causing the Data Breach.

### G. Defendant Owed Plaintiffs and Class Members a Common Law Duty to Safeguard their Private Information.

121. In addition to its obligations under federal and state laws, Defendant owed a duty

---

[11] CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY, *Shields Up: Guidance for Organizations*, https://www.cisa.gov/shields-guidance-organizations (last visited August 5, 2026).

to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant's duty owed to Plaintiffs and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected Plaintiffs' and Class Members' Private Information.

122. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

123. Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

124. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

125. Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

126. Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

127. Defendant failed to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. Defendant's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

### H. Plaintiffs and Class Members Suffered Common Injuries and Damages due to Defendant's Conduct.

128. Defendant's failure to implement or maintain adequate data security measures for

Plaintiffs' and Class Members' Private Information directly and proximately caused injuries to Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

129. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

130. Plaintiffs and Class Members are also at a continued risk because their Private Information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its patients' and/or clients' Private Information.

131. As a result of Defendant's ineffective and inadequate data security practices, the resulting Data Breach, and the foreseeable consequences of their Private Information ending up in criminals' possession, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including, without limitation, (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain with Defendant; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant

fails to undertake appropriate and adequate measures to protect it.

***The Risk of Identity Theft to Plaintiffs and Class Members Is Present and Ongoing.***

132. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

133. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[12] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

134. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

135. The dark web is an unindexed layer of the internet that requires special software or authentication to access. Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion. This prevents dark web

[12] 12 C.F.R. § 1022.3(h).
[13] 12 C.F.R. § 1022.3(g).

marketplaces from being easily monitored by authorities or accessed by those not in the know.

136. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information. As experts have warned, the anonymity of the dark web lends itself well to those who would seek to do financial harm to others.

137. The unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' Private Information.

138. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

139. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social

engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

140. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for credit lines.

141. Theft of PHI, in particular, is gravely serious as well: A thief may use your name or health insurance numbers "to get medical care, see a doctor, get prescription drugs, buy medical services, or submit claims with your insurance provider. If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use."[14]

142. Health information is likely to be used in detrimental ways, including by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.

143. One study found "the majority [70%] of data impacted by healthcare breaches could

---

[14] FEDERAL TRADE COMMISSION, *What to Know About Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited August 5, 2026).

be leveraged by hackers to commit fraud or identity theft."[15]

144. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[16]

145. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[17]

146. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[18]

147. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[19]

---

[15] DISTILIFO, *70% of Data Involved In Healthcare Breaches Increases Risk Of Fraud*, October 3, 2019, https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.

[16] *Id.*

[17] EXPERIAN, *Data Breach Response Guide*, July 31, 2025, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

[18] Andrew Steger, *What Happens to Stolen Healthcare Data*, HEALTHTECH, Oct. 30, 2019, https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[19] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground*

148. With Fullz packages, cybercriminals can cross-reference sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble dossiers on individuals.

149. The development of Fullz packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

150. Thus, even if certain information (such as Social Security numbers) was not stolen in the data breach, criminals can still easily create a comprehensive Fullz package.

151. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

152. The development of Fullz packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

153. Victims of identity theft can suffer from both direct and indirect financial losses.

---

*Stolen from Texas Life Insurance Firm*, KREBS ON SECURITY, Sep. 18, 2014, https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[20]

154. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

155. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

156. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

157. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

---

[20] Erika Harrell, *Victims of Identity Theft*, U.S. DEP'T OF JUST., NCJ 256085 (April 2021) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

158. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

159. In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face substantial costs and time to repair the damage to their good name and credit record.

160. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

161. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

162. These efforts are consistent with the steps the FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on

their credit, and correcting their credit reports.

163. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

***Diminished Value of Private Information***

164. Private Information is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

165. For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

166. Private Information can sell for as much as $363 per record according to the Infosec Institute.

167. Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.

168. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.

169. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

170. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Reasonable and Necessary Future Costs of Credit and Identity Theft Monitoring***

171. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

172. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

173. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as medical histories).

174. Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

175. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

***Loss of Benefit of the Bargain***

176. Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

177. When agreeing to provide their Private Information, which was a condition precedent to obtain services from Defendant, and paying Defendant, directly or indirectly, for its services, Plaintiffs and Class Members, as patients and consumers, understood and expected that they were, in part, paying for services and data security to protect the Private Information they were required to provide.

178. In fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

## I. Plaintiffs' Allegations

***<u>Plaintiff Eugene Chu</u>***

179. Plaintiff Chu is a former patient of VHC Health and was required to provide his Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services. VHC Health is a client of Defendant.

180. By accepting and storing Plaintiff Chu's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

181. Plaintiff Chu greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Chu diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

182. On or around June 5, 2026, Plaintiff Chu received a Notice Letter from Defendant informing him that his Private Information was impacted in the Data Breach. Upon information and belief, Plaintiff Chu is a victim of Defendant's Data Breach.

183. At the time of the Data Breach, Defendant retained Plaintiff Chu's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff Chu's Private Information in the Data Breach.

184. Plaintiff Chu would not have provided his Private Information to Defendant had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

185. Plaintiff Chu's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Chu's

highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

186. In response to the Data Breach, Plaintiff Chu made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, placing a credit freeze, and reviewing his credit reports. Plaintiff Chu estimates he has already spent at least 3 hours responding to the Data Breach and he spends 1 hour per week reviewing his accounts for fraudulent activity.

187. Plaintiff Chu further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

188. Because of the Data Breach, there is no doubt Plaintiff Chu's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Chu and the Class are at an imminent risk of identity theft and fraud.

189. Due to Defendant's Data Breach, Plaintiff Chu will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Chu's highly sensitive Private Information secure and protected against unauthorized disclosure.

190. Knowing that thieves intentionally targeted and accessed his Private Information has caused Plaintiff Chu great anxiety beyond mere worry.

191. The Data Breach has caused Plaintiff Chu to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private

Information was accessed and/or acquired by criminals as a result of the Data Breach.

192. As a direct and traceable result of the Data Breach, Plaintiff Chu suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Chu; and (vii) other economic and non-economic harm.

193. Plaintiff Chu has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

194. Plaintiff Chu has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Chu's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Jeffrey McGrath***

195. Plaintiff McGrath is a current patient of VHC Health and was required to provide his Private Information, including on information and belief his credit card information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical

services. VHC Health is a client of Defendant.

196. By accepting and storing Plaintiff McGrath's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

197. Plaintiff McGrath greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff McGrath diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

198. Upon information and belief, Plaintiff McGrath is a victim of Defendant's Data Breach.

199. At the time of the Data Breach, Defendant retained Plaintiff McGrath's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff McGrath's Private Information in the Data Breach.

200. Plaintiff McGrath would not have provided his Private Information to Defendant had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

201. Plaintiff McGrath's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff McGrath's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

202. In response to the Data Breach, Plaintiff McGrath made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, placing a credit freeze, and

reviewing his credit reports. Plaintiff McGrath estimates he has already spent at least 3 hours responding to the Data Breach. Plaintiff McGrath spends approximately 30 minutes per week reviewing and monitoring his account.

203. Plaintiff McGrath further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

204. Because of the Data Breach, there is no doubt Plaintiff McGrath's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff McGrath and the Class are at an imminent risk of identity theft and fraud.

205. Due to Defendant's Data Breach, Plaintiff McGrath will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff McGrath's highly sensitive Private Information secure and protected against unauthorized disclosure.

206. Knowing that thieves intentionally targeted and accessed his Private Information has caused Plaintiff McGrath great anxiety beyond mere worry.

207. The Data Breach has caused Plaintiff McGrath to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

208. Moreover, following the Data Breach, Plaintiff McGrath has experienced an uptick in spam communications and believes this to be an attempt to secure additional Private Information from him to steal his identity. Specifically, Plaintiff McGrath has noticed a marked increase in

spam calls and texts, the majority of which come from purported lending or insurance companies with which Plaintiff McGrath is not doing business and from which Plaintiff McGrath did not request any information.

209. Plaintiff McGrath has experienced actual misuse of his Private Information and fraud. Specifically, on or around June 2026, Plaintiff McGrath discovered a $200 unauthorized charge on his credit card which emanated from a home healthcare products company named Metavitality. In July 2026, Plaintiff McGrath discovered a second unauthorized transaction on his credit card in the amount of $260 which also emanated from Metavitality. Plaintiff McGrath was forced to close his credit card account. To date, only the first unauthorized transaction was reversed. Upon information and belief, Defendant maintained in its possession Plaintiff McGrath's Private Information, including the credit card details for his credit card that experienced unauthorized charges in June and July 2026, before, during, and after the Data Breach. Plaintiff McGrath attributes these fraudulent activities to the Data Breach based on temporal proximity, his careful handling of his Private Information, and the fact that these fraudulent activities are atypical in Plaintiff McGrath's experience.

210. Due to the fraudulent activity experienced by Plaintiff McGrath after the Data Breach, Plaintiff McGrath has maintained credit protection through Experian at a cost of $25.00 per month. This protection is reasonable and necessary given the fact that Plaintiff McGrath has already experienced misuse of his information which, upon information and belief, Defendant maintained in its inadequately protected systems.

211. As a direct and traceable result of the Data Breach, Plaintiff McGrath suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts

and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff McGrath; and (vii) other economic and non-economic harm.

212. Plaintiff McGrath has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

213. Plaintiff McGrath has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff McGrath's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Ray Wieters***

214. Plaintiff Wieters is a current patient of HonorHealth and was required to provide his Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services. HonorHealth is a client of Defendant.

215. By accepting and storing Plaintiff Wieters's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

216. Plaintiff Wieters greatly values his privacy and is very careful about sharing his

sensitive Private Information. Plaintiff Wieters diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

217. On or around June 12, 2026, Plaintiff Wieters received a Notice Letter from Defendant informing him that his Private Information was impacted in the Data Breach. Upon information and belief, Plaintiff Wieters is a victim of Defendant's Data Breach.

218. At the time of the Data Breach, Defendant retained Plaintiff Wieters's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff Wieters's Private Information in the Data Breach.

219. Plaintiff Wieters would not have provided his Private Information to Defendant had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

220. Plaintiff Wieters's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Wieters's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

221. In response to the Data Breach, Plaintiff Wieters made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Plaintiff Wieters estimates he has already spent at least 10 hours responding to the Data Breach.

222. Plaintiff Wieters further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

223. Because of the Data Breach, there is no doubt Plaintiff Wieters's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Wieters and the Class are at an imminent risk of identity theft and fraud.

224. Due to Defendant's Data Breach, Plaintiff Wieters will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Wieters's highly sensitive Private Information secure and protected against unauthorized disclosure.

225. Knowing that thieves intentionally targeted and accessed his Private Information has caused Plaintiff Wieters great anxiety beyond mere worry.

226. The Data Breach has caused Plaintiff Wieters to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

227. Moreover, following the Data Breach, Plaintiff Wieters has experienced an uptick in spam communications and believes this to be an attempt to secure additional Private Information from him to steal his identity. Specifically, Plaintiff Wieters has noticed a marked increase in spam calls related to the sale of medical equipment, insurance, and Medicare products which Plaintiff Wieters did not request. Defendant had Plaintiff Wieters's Private Information, including phone number, before, during, and after the Data Breach. Plaintiff Wieters attributes these unsolicited communications to the Data Breach based on temporal proximity, his careful handling of his Private Information, and the fact that this spam is atypical in Plaintiff Wieters's experience.

228. As a direct and traceable result of the Data Breach, Plaintiff Wieters suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Wieters; and (vii) other economic and non-economic harm.

229. Plaintiff Wieters has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

230. Plaintiff Wieters has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Wieters's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff LaWanda Campbell***

231. Plaintiff Campbell is a former patient of VHC Health and was required to provide her Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services. VHC Health is a client of Defendant.

232. By accepting and storing Plaintiff Campbell's Private Information, Defendant

agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

233. Plaintiff Campbell greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Campbell diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

234. Upon information and belief, Plaintiff Campbell is a victim of Defendant's Data Breach.

235. At the time of the Data Breach, Defendant retained Plaintiff Campbell's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff Campbell's Private Information in the Data Breach.

236. Plaintiff Campbell would not have provided her Private Information to Defendant had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

237. Plaintiff Campbell's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Campbell's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

238. In response to the Data Breach, Plaintiff Campbell made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Upon information and belief, Plaintiff Campbell estimates she has already spent hours responding to the Data Breach.

239. Plaintiff Campbell further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

240. Because of the Data Breach, there is no doubt Plaintiff Campbell's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Campbell and the Class are at an imminent risk of identity theft and fraud.

241. Due to Defendant's Data Breach, Plaintiff Campbell will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Campbell's highly sensitive Private Information secure and protected against unauthorized disclosure.

242. Knowing that thieves intentionally targeted and accessed her Private Information has caused Plaintiff Campbell great anxiety beyond mere worry.

243. The Data Breach has caused Plaintiff Campbell to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

244. Moreover, following the Data Breach, Plaintiff Campbell has experienced an uptick in suspicious spam calls, texts, and emails, and believes this to be an attempt to secure additional Private Information from her to steal her identity. The spam communications relate to loans and medical calls that Plaintiff Campbell does not recognize. Defendant had Plaintiff Campbell's Private Information, including phone number and email address, before, during, and after the Data Breach. Plaintiff Campbell attributes these unsolicited communications to the Data Breach based

on temporal proximity, her careful handling of her Private Information, and the fact that this spam is atypical in Plaintiff Campbell's experience.

245. As a direct and traceable result of the Data Breach, Plaintiff Campbell suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Campbell; and (vii) other economic and non-economic harm.

246. Plaintiff Campbell has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

247. Plaintiff Campbell has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Campbell's Private Information will be wholly unprotected and at-risk of future data breaches.

***<u>Plaintiff Jill Hurant</u>***

248. Plaintiff Hurant is a patient of Penn Medicine, Defendant's client, and was required

to provide her Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services.

249. By accepting and storing Plaintiff Hurant's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

250. Plaintiff Hurant greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Hurant diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

251. On or around June 30, 2026, Plaintiff Hurant received a Notice Letter from Defendant informing her that her Private Information was impacted in the Data Breach. Upon information and belief, Plaintiff Hurant is a victim of Defendant's Data Breach.

252. At the time of the Data Breach, Defendant retained Plaintiff Hurant's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff Hurant's Private Information in the Data Breach.

253. Plaintiff Hurant would not have provided her Private Information to Defendant had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

254. Plaintiff Hurant's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Hurant's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

255. In response to the Data Breach, Plaintiff Hurant made reasonable efforts to mitigate

the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Plaintiff Hurant estimates she has already spent at least 20 hours responding to the Data Breach.

256. Plaintiff Hurant further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

257. Because of the Data Breach, there is no doubt Plaintiff Hurant's highly confidential Private Information is in the hands of cybercriminals. Following the Data Breach, Plaintiff Hurant received a notification from Experian alerting her that her Private Information had been found on the dark web. This shows that Plaintiff Hurant's Private Information has been published on the Dark web. As such, Plaintiff Hurant and the Class are at an imminent risk of identity theft and fraud.

258. After the Data Breach, Plaintiff Hurant purchased credit monitoring through Experian and pays $27.00 per month for such service. Due to Defendant's Data Breach, Plaintiff Hurant will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Hurant's highly sensitive Private Information secure and protected against unauthorized disclosure.

259. Knowing that thieves intentionally targeted and accessed her Private Information has caused Plaintiff Hurant great anxiety beyond mere worry.

260. The Data Breach has caused Plaintiff Hurant to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Private

Information was accessed and/or acquired by criminals as a result of the Data Breach.

261. Moreover, following the Data Breach, Plaintiff Hurant has experienced an uptick in suspicious spam calls, texts, and emails, and believes this to be an attempt to secure additional Private Information from her to steal her identity. Defendant had Plaintiff Hurant's Private Information, including phone number and email address, before, during, and after the Data Breach. Plaintiff Hurant attributes these unsolicited communications to the Data Breach based on temporal proximity, her careful handling of her Private Information, and the fact that this spam is atypical in Plaintiff Hurant's experience.

262. Plaintiff Hurant has experienced fraud. Specifically, on or around June 12, 2026, Plaintiff Hurant received a notification informing her that she had been approved for a Capital One credit card that she did not apply for. Plaintiff Hurant provided Defendant with her Private Information, including name, date of birth, address, and Social Security number, which are sufficient sensitive information for cybercriminals to open a credit card account under her name. Further, on or around July 1, 2026, Plaintiff Hurant discovered that someone had used her Medicare ID number for the purchase of a monthly supply of catheters, totaling approximately $3000. Plaintiff Hurant contacted the local Medicare office to report the unauthorized purchase, and she received a new Medicare number. Defendant was in possession of Plaintiff Hurant's Medicare information at the time of the Breach. Plaintiff Hurant attributes these fraudulent activities to the Data Breach based on temporal proximity and the fact that these fraud attempts are atypical in Plaintiff Hurant's experience.

263. As a direct and traceable result of the Data Breach, Plaintiff Hurant suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit

reports for fraudulent activity; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Hurant; and (vii) other economic and non-economic harm.

264. Plaintiff Hurant has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

265. Plaintiff Hurant has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Hurant's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Noah Jensen***

266. Plaintiff Jensen is a patient of Defendant's client and was required to provide his Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services.

267. By accepting and storing Plaintiff Jensen's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

268. Plaintiff Jensen greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Jensen diligently protects his Private Information and stores

any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

269. On or around June 12, 2026, Plaintiff Jensen received a Notice Letter from Defendant informing him that his Private Information was impacted in the Data Breach. Upon information and belief, Plaintiff Jensen is a victim of Defendant's Data Breach.

270. At the time of the Data Breach, Defendant retained Plaintiff Jensen's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff Jensen's Private Information in the Data Breach.

271. Plaintiff Jensen would not have provided his Private Information to Defendant had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

272. Plaintiff Jensen's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Jensen's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

273. In response to the Data Breach, Plaintiff Jensen made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Plaintiff Jensen estimates he has already spent 2 hours responding to the Data Breach.

274. Plaintiff Jensen further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

275. Because of the Data Breach, there is no doubt Plaintiff Jensen's highly confidential

Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Jensen and the Class are at an imminent risk of identity theft and fraud.

276. Due to Defendant's Data Breach, Plaintiff Jensen will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Jensen's highly sensitive Private Information secure and protected against unauthorized disclosure.

277. Knowing that thieves intentionally targeted and accessed his Private Information has caused Plaintiff Jensen great anxiety beyond mere worry.

278. The Data Breach has caused Plaintiff Jensen to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

279. Moreover, following the Data Breach, Plaintiff Jensen has experienced an uptick in suspicious spam calls, texts, and emails, and believes this to be an attempt to secure additional Private Information from him to steal his identity. Defendant had Plaintiff Jensen's Private Information, including phone number and email address, before, during, and after the Data Breach. Plaintiff Jensen attributes these unsolicited communications to the Data Breach based on temporal proximity, his careful handling of his Private Information, and the fact that this spam is atypical in Plaintiff Jensen's experience.

280. As a direct and traceable result of the Data Breach, Plaintiff Jensen suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach,

including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Jensen; and (vii) other economic and non-economic harm.

281. Plaintiff Jensen has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

282. Plaintiff Jensen has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Jensen's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Gina Longoria***

283. Plaintiff Longoria is a patient of Defendant's client and was required to provide her Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services.

284. By accepting and storing Plaintiff Longoria's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

285. Plaintiff Longoria greatly values her privacy and is very careful about sharing her

sensitive Private Information. Plaintiff Longoria diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

286. On or around June 12, 2026, Plaintiff Longoria received a Notice Letter from Defendant informing her that her Private Information was impacted in the Data Breach. Upon information and belief, Plaintiff Longoria is a victim of Defendant's Data Breach.

287. At the time of the Data Breach, Defendant retained Plaintiff Longoria's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff Longoria's Private Information in the Data Breach.

288. Plaintiff Longoria would not have provided her Private Information to Defendant had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

289. Plaintiff Longoria's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Longoria's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

290. In response to the Data Breach, Plaintiff Longoria made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Plaintiff Longoria estimates she has already spent 2 hours responding to the Data Breach.

291. Plaintiff Longoria further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

292. Because of the Data Breach, there is no doubt Plaintiff Longoria's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Longoria and the Class are at an imminent risk of identity theft and fraud.

293. Due to Defendant's Data Breach, Plaintiff Longoria will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Longoria's highly sensitive Private Information secure and protected against unauthorized disclosure.

294. Knowing that thieves intentionally targeted and accessed her Private Information has caused Plaintiff Longoria great anxiety beyond mere worry.

295. The Data Breach has caused Plaintiff Longoria to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

296. Moreover, following the Data Breach, Plaintiff Longoria has experienced an uptick in suspicious spam calls, texts, and emails, and believes this to be an attempt to secure additional Private Information from her to steal her identity. Defendant had Plaintiff Longoria's Private Information, including phone number and email address, before, during, and after the Data Breach. Plaintiff Longoria attributes these unsolicited communications to the Data Breach based on temporal proximity, her careful handling of her Private Information, and the fact that this spam is atypical in Plaintiff Longoria's experience.

297. As a direct and traceable result of the Data Breach, Plaintiff Longoria suffered

actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Longoria; and (vii) other economic and non-economic harm.

298. Plaintiff Longoria has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

299. Plaintiff Longoria has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Longoria's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Kale Tinsley***

300. Plaintiff Tinsley is a former patient of UW Medicine, Defendant's client, and was required to provide his Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services.

301. By accepting and storing Plaintiff Tinsley's Private Information, Defendant agreed

to safeguard and protect it from unauthorized access and delete it after a reasonable time.

302. Plaintiff Tinsley greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Tinsley diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

303. Upon information and belief, Plaintiff Tinsley is a victim of Defendant's Data Breach.

304. At the time of the Data Breach, Defendant retained Plaintiff Tinsley's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff Tinsley's Private Information in the Data Breach.

305. Plaintiff Tinsley would not have provided his Private Information to Defendant had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

306. Plaintiff Tinsley's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Tinsley's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

307. In response to the Data Breach, Plaintiff Tinsley made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Plaintiff Tinsley estimates he has already spent 5 hours responding to the Data Breach.

308. Plaintiff Tinsley further anticipates spending considerable time and money on an

ongoing basis to try to mitigate and address harms caused by the Data Breach.

309. Because of the Data Breach, there is no doubt Plaintiff Tinsley's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Tinsley and the Class are at an imminent risk of identity theft and fraud.

310. Plaintiff Tinsley will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Tinsley's highly sensitive Private Information secure and protected against unauthorized disclosure.

311. Knowing that thieves intentionally targeted and accessed his Private Information has caused Plaintiff Tinsley great anxiety beyond mere worry.

312. The Data Breach has caused Plaintiff Tinsley to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

313. Moreover, following the Data Breach, Plaintiff Tinsley has experienced an uptick in suspicious spam calls, texts, and emails, and believes this to be an attempt to secure additional Private Information from him to steal his identity. Defendant had Plaintiff Tinsley's Private Information, including phone number and email address, before, during, and after the Data Breach. Due to a spike in spam communications, Plaintiff Tinsley purchased spam blocking services from Cloaked at a cost of $100 for an annual plan. Plaintiff Tinsley attributes these unsolicited communications to the Data Breach based on temporal proximity, his careful handling of his

Private Information, and the fact that this spam is atypical in Plaintiff Tinsley's experience.

314. As a direct and traceable result of the Data Breach, Plaintiff Tinsley suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Tinsley; and (vii) other economic and non-economic harm.

315. Plaintiff Tinsley has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

316. Plaintiff Tinsley has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Tinsley's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Richard Jesky***

317. Plaintiff Jesky is a patient of Defendant's client and was required to provide his Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services.

318. By accepting and storing Plaintiff Jesky's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

319. Plaintiff Jesky greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Jesky diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

320. On or around June 19, 2026, Plaintiff Jesky received a Notice Letter from Defendant informing him that his Private Information was impacted in the Data Breach. Upon information and belief, Plaintiff Jesky is a victim of Defendant's Data Breach.

321. At the time of the Data Breach, Defendant retained Plaintiff Jesky's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff Jesky's Private Information in the Data Breach.

322. Plaintiff Jesky would not have provided his Private Information to Defendant had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

323. Plaintiff Jesky's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Jesky's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

324. In response to the Data Breach, Plaintiff Jesky made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Plaintiff Jesky

estimates he has already spent 2 hours responding to the Data Breach.

325. Plaintiff Jesky further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

326. Because of the Data Breach, there is no doubt Plaintiff Jesky's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Jesky and the Class are at an imminent risk of identity theft and fraud.

327. Due to Defendant's Data Breach, Plaintiff Jesky will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Jesky's highly sensitive Private Information secure and protected against unauthorized disclosure.

328. Knowing that thieves intentionally targeted and accessed his Private Information has caused Plaintiff Jesky great anxiety beyond mere worry.

329. The Data Breach has caused Plaintiff Jesky to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

330. Moreover, following the Data Breach, Plaintiff Jesky has experienced an uptick in suspicious spam calls, texts, and emails, and believes this to be an attempt to secure additional Private Information from him to steal his identity. Specifically, the spam calls are related to inquiries about his credit card number and banking/financial information. Defendant had Plaintiff Jesky's Private Information, including his phone number and email address, before, during, and

after the Data Breach. Plaintiff Jesky attributes these unsolicited communications to the Data Breach based on temporal proximity, his careful handling of his Private Information, and the fact that this spam is atypical in Plaintiff Jesky's experience.

331. Further, on or around March 2026, Plaintiff Jesky received a notification from his bank alerting him about an unauthorized charge to his credit card. Plaintiff Jesky spent time and gas traveling to his bank to discuss the fraudulent charge and have it reversed. Upon information and belief, Defendant was in possession of Plaintiff Jesky's financial information, including his credit card information, at the time of the Data Breach because Plaintiff Jesky had not experienced fraudulent activity on his credit card prior to the Breach.

332. As a direct and traceable result of the Data Breach, Plaintiff Jesky suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Private Information; (iv) emotional distress because identity thieves now possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Jesky; and (vii) other economic and non-economic harm.

333. Plaintiff Jesky has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

334. Plaintiff Jesky has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Jesky's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Juells McLeod***

335. Plaintiff McLeod is a former patient of Mayo Clinic, Defendant's client, and was required to provide her Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services.

336. By accepting and storing Plaintiff McLeod's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

337. Plaintiff McLeod greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff McLeod diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

338. On or around June 5, 2026, Plaintiff McLeod received a Notice Letter from Defendant informing her that her Private Information was impacted in the Data Breach. Upon information and belief, Plaintiff McLeod is a victim of Defendant's Data Breach.

339. At the time of the Data Breach, Defendant retained Plaintiff McLeod's Private Information in its network systems with inadequate data security, which caused and allowed cybercriminals to target and steal Plaintiff McLeod's Private Information in the Data Breach.

340. Plaintiff McLeod would not have provided her Private Information to Defendant had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

341. Plaintiff McLeod's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff McLeod's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

342. In response to the Data Breach, Plaintiff McLeod made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Plaintiff McLeod estimates she has already spent 2 hours responding to the Data Breach.

343. Plaintiff McLeod further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

344. Because of the Data Breach, there is no doubt Plaintiff McLeod's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff McLeod and the Class are at an imminent risk of identity theft and fraud.

345. Due to Defendant's Data Breach, Plaintiff McLeod will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff McLeod's highly sensitive Private Information secure and protected against unauthorized disclosure.

346. Knowing that thieves intentionally targeted and accessed her Private Information has caused Plaintiff McLeod great anxiety beyond mere worry.

347. The Data Breach has caused Plaintiff McLeod to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

348. Moreover, following the Data Breach, Plaintiff McLeod has experienced an uptick in suspicious spam mail, and believes this to be an attempt to secure additional Private Information from her to steal her identity. Specifically, Plaintiff McLeod estimates she receives at least 30 letters in the mail per week relating to personal loan inquiries that she has not made and inquiries on car insurance policies for her partner's car that are addressed to Plaintiff McLeod. Defendant had Plaintiff McLeod's Private Information, including her home address, in its possession at the time of the Breach. Plaintiff McLeod attributes these unsolicited communications to the Data Breach based on temporal proximity, her careful handling of her Private Information, and the fact that this spam is atypical in Plaintiff McLeod's experience.

349. As a direct and traceable result of the Data Breach, Plaintiff McLeod suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff McLeod; and (vii) other economic and non-economic harm.

350. Plaintiff McLeod has been and will continue to be at a heightened and substantial

risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

351. Plaintiff McLeod has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff McLeod's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Daynique Johnson***

352. Plaintiff Johnson is a patient of Mayo Clinic, Defendant's client, and was required to provide her Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services.

353. By accepting and storing Plaintiff Johnson's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

354. Plaintiff Johnson greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Johnson diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

355. On or around June 12, 2026, Plaintiff Johnson received a Notice Letter from Defendant informing her that her Private Information was impacted in the Data Breach. Upon information and belief, Plaintiff Johnson is a victim of Defendant's Data Breach.

356. At the time of the Data Breach, Defendant retained Plaintiff Johnson's Private Information in its network systems with inadequate data security, which caused and allowed

cybercriminals to target and steal Plaintiff Johnson's Private Information in the Data Breach.

357. Plaintiff Johnson would not have provided her Private Information to Defendant had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

358. Plaintiff Johnson's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Johnson's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

359. In response to the Data Breach, Plaintiff Johnson made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and changing her passwords. Plaintiff Johnson estimates she has already spent roughly 2 hours responding to the Data Breach.

360. Plaintiff Johnson further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

361. Because of the Data Breach, there is no doubt Plaintiff Johnson's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Johnson and the Class are at an imminent risk of identity theft and fraud.

362. Due to Defendant's Data Breach, Plaintiff Johnson will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Johnson's highly sensitive

Private Information secure and protected against unauthorized disclosure.

363. Knowing that thieves intentionally targeted and accessed her Private Information has caused Plaintiff Johnson great anxiety beyond mere worry.

364. The Data Breach has caused Plaintiff Johnson to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

365. Moreover, following the Data Breach, Plaintiff Johnson has experienced an uptick in suspicious spam messages, and believes this to be an attempt to secure additional Private Information from her to steal her identity. Specifically, Plaintiff Johnson has received messages regarding attempts to access her Venmo account. Plaintiff Johnson attributes these unsolicited communications to the Data Breach based on temporal proximity, her careful handling of her Private Information, and the fact that this spam is atypical in Plaintiff Johnson's experience.

366. As a direct and traceable result of the Data Breach, Plaintiff Johnson suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Johnson; and (vii) other economic and non-economic harm.

367. Plaintiff Johnson has been and will continue to be at a heightened and substantial

risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

368. Plaintiff Johnson has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Johnson's Private Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff James Soward***

369. Plaintiff Soward is a patient of a client of Defendant and was required to provide his Private Information, directly or indirectly, to Defendant as part of Defendant's business practices and to receive medical services.

370. By accepting and storing Plaintiff Soward's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

371. Plaintiff Soward greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Soward diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

372. On or around June 12, 2026, Plaintiff Soward received a Notice Letter from Defendant informing him that his Private Information was impacted in the Data Breach. Upon information and belief, Plaintiff Soward is a victim of Defendant's Data Breach.

373. At the time of the Data Breach, Defendant retained Plaintiff Soward's Private Information in its network systems with inadequate data security, which caused and allowed

cybercriminals to target and steal Plaintiff Soward's Private Information in the Data Breach.

374. Plaintiff Soward would not have provided his Private Information to Defendant had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

375. Plaintiff Soward's Private Information was compromised in the Data Breach and stolen by cybercriminals, who illegally accessed Defendant's network for the specific purpose of targeting the Private Information and using it to commit identity theft and fraud. Plaintiff Soward's highly sensitive Private Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

376. In response to the Data Breach, Plaintiff Soward made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Plaintiff Soward attempted to enroll in the credit monitoring offered by Defendant but was unable to do so. When he contacted the phone number provided by Defendant, he spoke to a representative who promised a return call, but it never came.

377. Plaintiff Soward further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

378. Because of the Data Breach, there is no doubt Plaintiff Soward's highly confidential Private Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Soward and the Class are at an imminent risk of identity theft and fraud. Indeed, Plaintiff Soward has received notification that his Private Information has been found on the dark web.

379. Due to Defendant's Data Breach, Plaintiff Soward will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data

stolen in the Data Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Soward's highly sensitive Private Information secure and protected against unauthorized disclosure.

380. Knowing that thieves intentionally targeted and accessed his Private Information has caused Plaintiff Soward great anxiety beyond mere worry.

381. The Data Breach has caused Plaintiff Soward to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Private Information was accessed and/or acquired by criminals as a result of the Data Breach. Plaintiff Soward has experienced sleepless nights due to ongoing concern about the Data Breach and the exposure of his Private Information.

382. Moreover, following the Data Breach, Plaintiff Soward has experienced an uptick in spam communications and believes this to be an attempt to secure additional Private Information from him to steal his identity. Defendant had Plaintiff Soward's Private Information, including phone number, before, during, and after the Data Breach. Plaintiff Soward attributes these unsolicited communications to the Data Breach based on temporal proximity, his careful handling of his Private Information, and the fact that this spam is atypical in Plaintiff Soward's experience.

383. As a direct and traceable result of the Data Breach, Plaintiff Soward suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Private Information; (iv) emotional distress because identity thieves now

possess his Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and published on the dark web; (vi) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff Soward; and (vii) other economic and non-economic harm.

384. Plaintiff Soward has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach.

385. Plaintiff Soward has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Soward's Private Information will be wholly unprotected and at-risk of future data breaches.

## CLASS ALLEGATIONS

386. Plaintiffs bring this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class:

> All individuals in the United States whose Private Information was compromised in the Data Breach, including all individuals that received a Notice Letter (the "Class").

387. Excluded from the Class are Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families, and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any excluded party, the judicial officer(s) to whom this action is assigned, and members of their immediate families.

388. Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to moving for class certification.

389. This action has been brought and may properly be maintained as a class action

under Federal Rule of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation, and membership in the proposed class is easily ascertainable.

390. **Numerosity:** The Class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendants' records, including but not limited to, the files implicated in the Data Breach. On information and belief, the Class consists of at least hundreds of thousands of individuals.

391. **Commonality:** This action involves questions of law and fact that are common to all Class Members. Such common questions include, but are not limited to the following:

a. Whether Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant failed to implement reasonable data security measures for Plaintiffs' and Class Members' Private Information;

c. Whether Defendant breached implied contracts with Plaintiffs and Class Members to use reasonable means to protect their Private Information;

d. Whether Defendant was unjustly enriched by failing to implement reasonable or adequate data security measures;

e. Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct;

f. Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

g. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

392. **Typicality:** Plaintiffs' claims are typical of the claims of the Class Members. The claims of the Plaintiffs and members of the Class are based on the same legal theories and arise from the same failure by Defendant to safeguard Private Information. Plaintiffs and Class Members all provided their Private Information to Defendant and had their Private Information accessed, exfiltrated, and compromised in the Data Breach.

393. **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members Plaintiffs seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation, specifically litigation involving data breaches; Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class Members.

394. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. For example, Defendant's liability and the existence of damages is common to Plaintiffs and each member of the Class. If Defendant breached its common law and statutory duties to secure Private Information on its network server, then Plaintiffs and each Class Member suffered damages from the exposure of sensitive Private Information in the Data Breach.

395. **Superiority.** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making this action superior to individual actions.

396. **Manageability.** The precise size of the Class is unknown without the disclosure of Defendant's records. The claims of Plaintiffs and the Class Members are substantially identical as explained above. Certifying the case as a class action will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiffs and the Class.

397. **Ascertainability.** Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Upon information and belief, Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### COUNT I
### GROSS NEGLIGENCE/NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

398. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 397 above as if fully set forth herein.

399. Defendant required Plaintiffs and Class Members to submit private, confidential Private Information to Defendant as a condition of receiving services from Defendant.

400. Plaintiffs and Class Members provided certain Private Information to Defendant including their names, addresses, Social Security numbers, dates of birth, medical information, health insurance information, and other sensitive information.

401. Defendant had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendant had a duty to Plaintiffs and each Class Member to exercise reasonable care in holding, safeguarding, and

protecting that Private Information.

402. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendant.

403. Plaintiffs and the Class Members had no ability to protect their Private Information in Defendant's possession.

404. By collecting and storing Plaintiffs' and Class Members' Private Information in its network systems, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect if that Private Information was exposed to unauthorized actors and to give prompt notice to those affected in the case of a data breach.

405. Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

406. Defendant owed a duty of care to Plaintiffs and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

407. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its clients' policyholders and patients, which is recognized by laws and regulations including but not limited to the FTC Act and HIPAA, as well as the common law. Defendant was able to ensure that its systems were sufficient to protect

against the foreseeable risk of harm to Plaintiffs and Class Members from an event like this Data Breach.

408. Defendant's duty also arose from its position as a healthcare covered entity. Defendant holds itself out as a trusted provider of healthcare-related services, and thereby assumes a duty to reasonably protect its patients' Private Information. Indeed, Defendant, as a healthcare provider, was in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members due to the Data Breach.

409. Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

410. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

411. Pursuant to HIPAA, 42 U.S.C. § 1320d *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

412. Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304.

413. Defendant breached its duties to Plaintiffs and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security

practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to encrypt, de-identify, or timely delete the Private Information from its network systems.

414. The injuries to Plaintiffs and Class Members resulting from the Data Breach were directly and indirectly caused by Defendant's violation of the statutes described herein.

415. Plaintiffs and Class Members are within the class of persons the FTC Act and HIPAA were intended to protect.

416. The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA were intended to guard against.

417. Defendant's failures to comply with the FTC Act and HIPAA, including regulations thereunder, constitute negligence *per se.*

418. Defendant's duty to use reasonable care in protecting Plaintiffs' and Class Members' confidential Private Information in its possession arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards applicable to such Private Information.

419. Defendant breached its duties, and was negligent, by acts of omission or commission, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;
b. Failing to adequately train employees on proper cybersecurity protocols;
c. Failing to adequately monitor the security of its networks and systems; and
d. Failing to periodically ensure that its network system had plans in place to maintain

reasonable data security safeguards.

420. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised and they would not have been injured.

421. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyber-attacks and data breaches in the industry.

422. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in one or more types of injuries to them.

423. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of the bargain; and (f) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

424. The specific reckless and grossly negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' PII/PHI;

b. Failing to adequately monitor the security of its networks and systems and to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information;

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards; and

d. Failing to detect the breach at the time it began or within a reasonable time thereafter;

e. Failing to follow its own privacy policies and practices published to the current and former patients of its customers.

425. Defendant's conduct went far beyond ordinary negligence. Defendant acted with gross negligence by consciously and recklessly disregarding known risks to Plaintiffs' Private Information, including by failing to implement basic and industry-standard cybersecurity measures, failing to adequately monitor its systems for unauthorized access, failing to remediate known security vulnerabilities, failing to properly train employees on data security, and failing to timely detect and prevent the Data Breach. Defendant knew or should have known that its inadequate data-security practices created a high probability of harm to Plaintiffs and the Class, yet Defendant consciously failed to take reasonable steps to prevent that harm.

426. Defendant's grossly negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiffs and the Class. Defendant's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiffs and the Class, whose sensitive personal information Defendant was entrusted to protect.

427. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored, and the foreseeable consequences of a data breach on

Defendant's systems.

428. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

429. Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

430. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

431. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 397 above as if fully set forth herein.

432. Defendant entered into contracts, written or implied, with its clients to perform services that include, but are not limited to, providing medical coding and risk adjustment services. Upon information and belief, these contracts are virtually identical between and among Defendant and its clients around the country whose customers and patients, including Plaintiffs and Class Members, were affected by the Data Breach.

433. In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiffs and the Class.

434. These contracts were made expressly for the benefit of Plaintiffs and the Class, as

Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its clients. Defendant knew that if it were to breach these contracts with its clients, its clients' policyholders and patients—Plaintiffs and Class Members—would be harmed.

435. Defendant breached the contracts it entered into with its clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detect the Data Breach and notify Plaintiffs and Class Members thereof.

436. As a direct and proximate result of Defendant's acts and omissions set forth above, Plaintiffs' and Class Members' Private Information was disclosed to third parties without authorization, causing Plaintiffs and Class Members to suffer injuries and damages as set forth herein, including, without limitation, (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

437. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the Private Information maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiffs and Class Members have no adequate

remedy at law for the injuries in that a judgment for monetary damages would not prevent the continued dissemination and misuse of their Private Information, which would remain at risk for years to come.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

438. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 397 above as if fully set forth herein.

439. This count is brought in the alternative to the breach of third-party beneficiary contract count above.

440. Plaintiffs and Class Members conferred a benefit on Defendant by way of paying and providing their Private Information to Defendant as part of Defendant's business as a healthcare provider.

441. The monies paid to Defendant were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiffs and Class Members.

442. Defendant failed to provide reasonable security, safeguards, and protections to the personal information of Plaintiffs and Class Members, and as a result Defendant was overpaid.

443. Under principles of equity and good conscience, Defendant should not be permitted to retain the money because it failed to provide adequate safeguards and security measures to protect Plaintiffs' and Class Members' personal information that they paid for but did not receive.

444. Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

445. Defendant's enrichment at Plaintiffs' and Class Members' expense is unjust.

446. As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

**COUNT IV**
**INVASION OF PRIVACY/INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiffs and the Class)**

447. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 397 above as if fully set forth herein.

448. Plaintiffs and Class Members had a legitimate expectation of privacy as to their Private Information and were entitled to Defendant's protection of this Private Information in its possession against disclosure to unauthorized third parties.

449. Defendant owed a duty to its patients and clients, including Plaintiffs and Class Members, to keep their Private Information confidential and secure.

450. Defendant failed to protect Plaintiffs' and Class Members' Private Information and instead, exposed it to unauthorized persons which is now publicly available, including on the dark web, and being fraudulently misused.

451. Defendant allowed unauthorized third parties access to and examination of the Private Information of Plaintiffs and Class Members, by way of Defendant's failure to protect the Private Information.

452. The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiffs and Class Members is highly offensive to a reasonable person.

453. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and Class Members disclosed their Private Information to Defendant as a

condition of receiving services, but privately with an intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

454. The Data Breach constitutes an intentional or reckless interference by Defendant with Plaintiffs' and Class Members' interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

455. Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it had actual knowledge that its information security practices were inadequate and insufficient.

456. Defendant acted with reckless disregard for Plaintiffs' and Class Members' privacy when it allowed improper access to its systems containing Plaintiffs' and Class Members' Private Information without protecting said data from the unauthorized disclosure, or even encrypting such information.

457. Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and implement appropriate policies to prevent the unauthorized release of Plaintiffs' and Class Members' Private Information.

458. Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and Class Members.

459. As a direct and proximate result of Defendant's acts and omissions set forth above, Plaintiffs' and Class Members' Private Information was disclosed to third parties without

authorization, causing Plaintiffs and Class Members to suffer injuries and damages as set forth herein, including, without limitation, (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

460. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the Private Information maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages would not prevent the continued dissemination and misuse of their Private Information, which would remain at risk for years to come.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment as follows:

A. An Order certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B. Awarding Plaintiffs and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

D. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

E. Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Any and all such relief to which Plaintiffs and the Class are entitled.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: September 14, 2026

Respectfully submitted,

*/s/ J. Gerard Stranch, IV*

J. Gerard Stranch, IV (BPR 23045)
Grayson Wells (BPR 039658)
John C. Roberts (BPR 042673)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com

Mariya Weekes (*pro hac vice* forthcoming)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Telephone: 786-879-8200
mweekes@milberg.com

Jeff Ostrow (*pro hac vice*)
**KOPELOWITZ OSTROW P.A.**

One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

*Interim Co-Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

It is hereby certified that a true and accurate copy of the foregoing was this September 14, 2026 filed using the CM/ECF system, which will electronically serve all counsel of record.

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR 23045)